ROCKY MOUNTAIN HELICOPTERS, INC., a Utah corporation; and Air Today, Inc., Appellants (Defendants),

v.

AIR FREIGHT, INC., a Wyoming corporation; and Kenneth B. McIntosh, Appellees (Plaintiffs).

AIR FREIGHT, INC., a Wyoming corporation; and Kenneth B. McIntosh, Appellants (Plaintiffs),

v.

ROCKY MOUNTAIN HELICOPTERS, INC., a Utah corporation; and Air Today, Inc., Appellees (Defendants).

Nos. 88–213, 88–214.

Supreme Court of Wyoming.

April 24, 1989.

Richard R. Wilking of Schwartz, Bon, McCrary & Walker, Casper, for Rocky Mountain Helicopters, Inc. and Air Today, Inc.

Robert S. Young, Provo, Utah, for Rocky Mountain Helicopters, Inc.

Donald E. Chapin and Charles S. Chapin of Crowell & Chapin, P.C., Casper, for Air Freight, Inc. and Kenneth B. McIntosh.

Before THOMAS, MACY and GOLDEN, JJ., ROONEY, Retired J., and LANGDON, District Judge.

ROONEY, Retired Justice.

Both the parties plaintiff[1] and two of the parties defendant[2] appeal from a judgment and decree in an action in which claims and counterclaims resulted from a sale of corporate stock and lease of an aircraft.

We affirm the judgment and decree of the trial court except for a mathematical correction in the amount of interest awarded on two promissory notes involved in the corporate stock sale transaction and except for a correction of the figure allowed Rocky Mountain Helicopters, Inc. and Air Freight, Inc. as an offset on accounts receivable. The case is remanded for the purpose of making such corrections.

A more than usual review of the history of this case is helpful in understanding the issues on appeal.

Kenneth B. McIntosh (McIntosh) owned the stock in Air Freight, Inc. (Freight), and he owned the majority of the stock of Air Today, Inc. (Air).

Freight operated a ground cartage service in Wyoming, Montana and Colorado for distribution to addressees of packages and documents which had been transported by air into the area from other areas, and for collection of packages and documents from senders in the area for delivery to air freight carriers for transportation by air to other areas.

Air operated a service for transportation of packages and documents by air to and from various points in the Rocky Mountain area, connecting in Denver, Colorado with principal air freight carriers such as Federal Express.

On May 31, 1985, a purchase agreement resulted in the purchase of the corporate stock of Air by RMH Aeroservices, Inc.

RMH Aeroservices, Inc. took over the operation of Air at that time, but it was unable to complete its financial obligations under the agreement. On October 4, 1985, Rocky Mountain Helicopters, Inc. (RMH) replaced RMH Aeroservices, Inc. in the transaction and executed an agreement with McIntosh and Air for the purchase of the corporate stock and assets from Air. On the same date and in consideration of the purchase, RMH gave a $39,126.72 promissory installment note to McIntosh and a $14,471.72 promissory installment note to Freight.

On February 15, 1985, Freight leased an aircraft to Air. One of the provisions of the lease required payment of an "engine reserve" by lessee Air at the rate of $35 per hour of flight. "Engine reserve" is an amount of money set aside or reserved for the purpose of paying for the engine, the engine component and the propeller overhaul required after they are subject to a set amount of flight service.

The complaint of McIntosh and Freight contained four claims for relief: one on the $39,126.72 note to McIntosh on which it was alleged there had been no payments; one on the $14,471.72 note to Freight on which it was alleged there had been no payments; one for $9,100[3] alleged for "engine reserve"; and one for $50,375.20 for an open account resulting from ground service transportation by Freight of packages and documents for Air. There was also a request for attorney's fees[4] and costs.

The answer of RMH, Air and RMH Aeroservices, Inc., contained denials and admissions to the allegations of the complaint, and it set up affirmative defenses of (1) an offset by amounts specified in the counterclaims, (2) estoppel through plaintiffs' "misconduct and negligence," (3) failure to state a claim with reference to the claim for relief re: "engine reserve," and (4) accord and satisfaction, release, settlement

---

1. Air Freight, Inc. and Kenneth B. McIntosh were parties plaintiff.

2. Rocky Mountain Helicopters, Inc., Air Today, Inc., and RMH Aeroservices, Inc. were parties defendant. RMH Aeroservices was subsequently dismissed from the action.

3. The court found $6,124.87 as the amount substantiated at trial.

4. Attorney's fees were claimed in the amount of $32,534.10.

and waiver with reference to the claim for relief for payment of open accounts.

The counterclaim of RMH, Air and RMH Aeroservices, Inc., contained eight claims for relief: one for breach of warranties and representations by McIntosh; one for furnishing false and misleading materials and representations by McIntosh and Freight; one for fraud based on the furnishing of such materials and representations; one for imputation of actions between McIntosh and Freight (abandoned at the close of evidence); two for an accounting; one for a declaratory judgment of the rights, liabilities and obligations of the parties; and one for costs and attorney's fees. Damages were alleged in the amount of $685,000 with a request for an additional $100,000 in punitive damages based on the counterclaim for fraud.

The district court gave judgment (1) for McIntosh and against RMH on the two promissory installment notes for their face amount together with interest at the rate of 13%, (2) for Freight and against Air for "engine reserve" in the amount of $6,124.87, (3) for Freight and against Air on the open account claim in net amount of $23,468.23, after offsetting against the amount "substantiated" by Freight ($52,041) the amount "substantiated" by Air ($28,572.27), (4) for RMH and against McIntosh and Freight in the amount of $9,067.33 on a warranty in the stock purchase agreement that tax payments were current as of May 31, 1985, and (5) for Air and against McIntosh for a personal debt incurred by use of Air's credit card in the amount of $480. The judgment and decree stated that *the burden of proof was not carried* with reference to the claims for relief contained in the counterclaims premised on (1) fraud and misrepresentation, (2) on an obligation to make an account, (3) on need for declaratory judgment founded on conversion of funds and assets, or (4) on a breach of warranty by McIntosh and Freight regarding the collectibility of Air's accounts receivable. Attorney's fees were not allowed for either party.

RMH and Air, appellants in Case No. 88-213, word the issues on appeal:

"A. Did the court err in failing to award damages on the counterclaims for misrepresentation and breach of warranty regarding the collectibility of accounts receivable, the existence of prepaid assets and the general profitability of the company?

"B. Does the evidence support the court's award of $6,124.87 in unpaid engine reserves due under the aircraft lease (Exhibit 12)?

"C. Did the trial court err in finding that Air Today owed Air Freight $6,124.87 on the engine reserve claim? Further, did the court err in finding Air Today had failed to substantiate the deductions Air Today claimed for 'owner charge-backs?'

"D. Did the trial court err in rejecting evidence that was offered through Paul Alden of additional taxes that had not been paid by McIntosh?

"E. Did the trial court err in refusing evidence of Appellant's attorney's fees?

"F. Did the court err in calculating the interest to be awarded on the judgment?"

McIntosh and Freight, appellants in Case No. 88-214, word them:

"A. Did the Trial Court error in not awarding Appellants their attorneys fees pursuant to Exhibit 7, the October 4, 1985 Agreement between the Appellants and Appellee, Rocky Mountain Helicopters, Inc.[?]

"B. Did the Court error when it awarded the Appellee, Air Today on offset against the judgment of Air Freight for an open account balance in the amount of $19,573.00 [sic][?]"

Excepting the last three issues stated by RMH and Air, i.e., those pertaining to attorney's fees, to rejecting evidence offered through witness Alden concerning taxes, and to calculation of interest, and excepting the first issue stated by Freight and McIntosh, i.e., that pertaining to attorney's fees, all of the stated issues concern the sufficiency of the evidence. Accordingly, the following standards are applicable to them:

"We have often said that, on appeal, we assume the truth of the evidence in favor of the successful party, ignore that of the unsuccessful party in conflict therewith, and give that of the successful party every favorable inference which may be reasonably drawn therefrom. E.g. *Goggins v. Harwood,* 704 P.2d 1282, 1284 (Wyo.1985); *Stockton v. Sowerwine,* 690 P.2d 1202, 1205 (Wyo.1984); *In Re Merrill's Estate,* [80 Wyo. 276] 341 P.2d [506] at 508 (1959); and cases cited therein."

*May v. Estate of McCormick by Swallow,* 769 P.2d 395, 397 (Wyo.1989).

"The phrase 'burden of proof' is often used as meaning the necessity of establishing a fact to a legally required extent, or the necessity of finally establishing a fact. 31 C.J.S. Evidence § 103, p. 709."

*Tench v. Weaver,* 374 P.2d 27, 29 (Wyo. 1962).

"[T]he term [burden of proof] denotes the duty of establishing the truth of a given proposition or issue by such a quantum of evidence as the law demands in the case in which the issue arises[.]"

29 Am.Jur.2d Evidence § 123 at 154 (1967).

### MISREPRESENTATION AND BREACH OF WARRANTY

#### (Issue A of RMH and Air)

In their answer, RMH and Air acknowledged the execution and delivery of the two promissory notes and the fact that no payment had been made thereon. They now argue that they should have been awarded setoff damages on their counterclaims (1) for breach of contract and fraud "with respect to the financial status of Air Today and *specifically to the existence of prepaid assets* " (emphasis added), and (2) for breach of "warranty that the Air Today accounts receivable were collectible." The argument is with reference to the representations and warranties contained in Article Two of the October 4, 1985, Stock Purchase Agreement. The following are the portions thereof pertinent to this issue:

---

5. The first paragraph of the agreement identifies RMH as "Buyer" and McIntosh and Air as "Sell-

"*ARTICLE TWO:* REPRESENTATIONS AND WARRANTIES OF SELLERS.[5]

"SELLERS, jointly and severally, hereby represent and warrant that, *to the best of their knowledge:*

\* \* \* \* \* \*

"E. Exhibit A to this agreement sets forth consolidated and consolidating balance sheets of AIR TODAY *as of April 30, 1985,* and the related consolidated and consolidating statements of income and retained earnings for the period ending on those dates, prepared by Edward T. Hager, AIR TODAY's independent public accountants, whose opinions with respect to such financial statements are included in that Exhibit. Exhibit A2 to this Agreement sets forth *unaudited* consolidated and consolidating balance sheets of AIR TODAY *as of April 30, 1985,* together with related unaudited consolidated and consolidating statements of income and retained earnings for the four month period ending on those dates, certified by the treasurer of AIR TODAY. The financial statements in Exhibits A1 and A2 are referred to as the financial statements. The financial statements have been prepared in accordance with generally accepted accounting principles consistently followed by AIR TODAY throughout the periods indicated, and fairly present the financial position of AIR TODAY as of the respective dates of the balance sheets included in the financial statements and the results of its operations for the respective periods indicated. *The parties agree that after May 21, 1985, Edward T. Hager has not examined the books and records of AIR TODAY and that the accounting for said company has been within the control of Sellers.*

"F. AIR TODAY, *insofar as it is aware,* has no debt, liability, or obligation of any nature, whether accrued, absolute, contingent, or otherwise, and

---

ers."

whether due or to become due, that is not reflected or reserved against in AIR TODAY's consolidated balance sheet as of *April 30, 1985* included in the financial statements or set forth in Exhibit A1 and A2 to this Agreement, except for those (a) that may have been incurred after the date of that consolidated balance sheet and (b) that are not required by generally accepted accounting principles to be included in a balance sheet. All debts, liabilities, and obligations incurred after that date were incurred in the ordinary course of business, and are usual and normal in amount both individually and in the aggregate.

\* \* \* \* \* \*

"I. Exhibit C to this Agreement is a complete and accurate schedule of the accounts receivable of AIR TODAY as reflected in the consolidated balance sheet included in the financial statements, together with an accurate aging of these accounts *to May 31, 1985*. All accounts receivable reflected in Exhibit C arose from valid sales in the ordinary course of business. These accounts have in part been collected since May 31, 1985, or were on said date, in the opinion of Seller, collectible in their full amounts less a reserve of 4% of the aggregate of accounts receivable. *The parties recognize that after May 31, 1985, Buyer in the operation of AIR TODAY, has accrued on the books of said corporation, accounts receivable, has received proceeds of those and previous accounts receivable,* all of which it represents to have deposited in the accounts of AIR TODAY. McIntosh will forthwith diligently assist Buyer in the collection of AIR TODAY's delinquent accounts receivable.

"J. AIR TODAY has good and marketable title to all its assets and interests in assets, whether real, personal, mixed, tangible, or intangible, which constitute all the assets and interests in assets that are used in the businesses of AIR TODAY. All these assets are free and clear of restrictions on or conditions to transfer or assignment, and free and clear of mortgages, liens, pledges, charges, encumbrances, equities, claims, easements, rights of way, covenants, conditions, or restrictions, except for (1) those disclosed in AIR TODAY's current consolidated balance sheet included in the financial statements, or in Exhibit[ ( ]s) B1 and B2 to this agreement; (2) the lien of current taxes not yet due and payable; and (3) possible minor matters that, in the aggregate, are not substantial in amount and do not materially detract from or interfere with the present or intended use of any of these assets, nor materially impair business operations. All real property and tangible personal property of AIR TODAY is in good operating condition and repair, ordinary wear and tear excepted. AIR TODAY is [i]n possession of all premises leased to it from others.

\* \* \* \* \* \*

"S. *Insofar as Sellers are aware,* none of the representations and warranties made by the Shareholder or AIR TODAY, or made in any certificate or memorandum furnished or to be furnished by any of them, or on their behalf, contains or will contain any untrue statement of a material fact, or omit any material fact the omission of which would be misleading.

"T. Exhibit G–2 lists all accounts payable of AIR TODAY including accurate and complete details by aging schedule or each and every party to which AIR TODAY is indebted in any manner." (Emphasis added.)

■■■ Obviously, the first inquiry with reference to the nature and extent of the representations and warranties contained in Article Two is: To what extent are the representations and warranties limited by the words "to the best of their knowledge" in the introductory paragraph? To be actionable, must it be shown that "Sellers" had knowledge of any inaccuracy in the representations and warranties? If so, such was not here shown. There was no evidence that McIntosh or Air had such knowledge or that the information in the financial statements and lists of accounts receivable furnished by them was not be-

lieved by them to be true and accurate. This is not a situation in which the fact or facts represented or warranted are entirely within the ability of the ones making the representation or warranty to personally verify. The financial statements were prepared for them by Edgar T. Hager, a certified public accountant, and the accounts receivable were listed on a computer printout containing over 1,500 entries, many of the invoice amounts being in the less than $100 range.

"On the question whether it is necessary to prove that a representation was knowingly false, where an action of deceit at law is brought, the authorities are not in entire harmony. The rule is well settled, however, in most American jurisdictions and in the English courts, that in a law action of deceit in tort, scienter must be established. Scienter, a term usually employed in legal issues involving fraud, means knowledge on the part of a person making representations, at the time when they are made, that they are false. Accordingly, under the rule prevailing in most jurisdictions, in order to sustain a charge of fraud in the making of a false representation, it must appear either that the party making it knew that it was false, or else that it was made under such circumstances as to raise a presumption of knowledge. Where all other elements necessary to a cause of action are established, one can obviously be held liable in tort for representations definitely known to be false and made with a deliberate attempt at deception."

37 Am.Jur.2d Fraud and Deceit § 197 at 260–61 (1968) (footnotes omitted). One is not liable in fraud for statements made in good faith based on knowledge had at the time. *Walter v. Moore*, 700 P.2d 1219 (Wyo.1985).

In this case, not only was the element of scienter not evidenced, but RMH and Air were forewarned that the financial matters and lists of accounts receivable were "to the best of [McIntosh's and Freight's] knowledge." Paragraph S of Article Two again recites that the representations and warranties will not contain "any untrue statement of a material fact, or omit any material fact the omission of which would be misleading" *prefaced by "[i]nsofar as Sellers are aware."* (Emphasis added.)

■ Beyond that, proof of the alleged breaches was complicated by the fact that the audit upon which they were premised [6] concerned the period from January 1, 1985 to October 4, 1985, thus including the period subsequent to May 31, 1985, when RMH Aeroservices had control of the operations of Air. Paragraphs E and I of Article Two of the October 4, 1985 Stock Purchase Agreement contain representations *as of April 30, 1985 and May 31, 1985 respectively.* Accordingly, any defects in the audit and accounts receivable could have been occasioned during the time the operations were under the control of RMH and, therefore, not being attributable to McIntosh. This potential was anticipated in the October 4, 1985 Stock Purchase Agreement. The last sentence in Section E of Article Two, supra, states that "[t]he parties agree that after May 31, 1985, Edward T. Hager has not examined the books and records of AIR TODAY and that the accounting for said company has been within the control of Sellers." Paragraphs 2 and 3 of the October 4, 1985 Stock Purchase Agreement provide in part:

"WHEREAS, the parties did, on May 31, 1985, enter into a Stock Purchase Agreement, (hereinafter referred to as ('AGREEMENT'), * * *

"WHEREAS, since the execution of the AGREEMENT, *Buyer*[7] *has been managing, operating and in control of*

---

**6.** Witness Simpson, treasurer of RMH, conducted such internal audit of Air during the period of October 4, 1985 and December 1985. He testified that the audit showed a loss of $105,-573.10 during the period of January 1, 1985 through October 4, 1985, and that the loss could be attributable to "either RMH Aeroservices

and/or Rocky Mountain Helicopters." The alleged breaches of the warranties relative to financial condition and accounts receivable were based on this audit.

**7.** The first paragraph of the October 4, 1985 agreement identifies RMH as "buyer."

the business affairs of *AIR TODAY*, \* \* \*. *It is the intention of the parties* to update the AGREEMENT to represent current status of the parties and *to recognize the operation of AIR TODAY by Buyer since execution of the AGREEMENT."* (Emphasis added.)

Not only could the trial court find the evidence insufficient to prove a loss attributable to the period prior to May 31, 1985 (and therefore that the financial representations as of that date to be other than represented), but the fact that RMH had been "managing, operating and in control of the business affairs of AIR TODAY" for four months before executing the Stock Purchase Agreement was a basis for concluding that RMH had become well aware of Air's financial condition before executing the October 4, 1985 Stock Purchase Agreement. Witness Taft, general manager of Air during the period, testified that during that period he talked to the president of RMH about the viability of Air. There was testimony that unsuccessful efforts were made by Air during the period to obtain loans from two banks. The financial material compiled by Mr. Hager and timely furnished to RMH confirmed the statement made by McIntosh to the president of RMH prior to May 31, 1985 that Air had been "marginally profitable."

Thus, there was evidence from which the trial court could conclude that RMH did not rely only on the representations of McIntosh and Air in executing the Stock Purchase Agreement on October 4, 1985. Such reliance is necessary for success in an action for fraud:

> "In *Johnson v. Soulis,* Wyo., 542 P.2d 867, 872 (1975), this court reiterated the requisites for fraud when we said:
>
>> " 'In Wyoming the elements of an action for fraud have been identified as a false representation by a defendant of material facts *which are relied upon* by a plaintiff to his damage. *Davis v. Schiess,* Wyo., 417 P.2d 19 (1966).' "

*Dawson v. Lohn,* 705 P.2d 853, 857 (Wyo. 1985) (emphasis added).

■ With reference to the prepaid assets, the evidence before the trial court included the status thereof as contained in the Hager compilation, and it contained that as contained in the Simpson audit. Witness Simpson testified:

> "Q. Can you tell me what you found with respect to prepaid assets?
>
> "A. I wrote off approximately $50,000. worth of prepaid aircraft leases that were shown on the income statement on the balance sheet.
>
> "Q. What was the purpose of that?
>
> "A. The company had no prepaid assets that I could determine.
>
> "Q. And where did prepaid assets appear?
>
> "A. Under the category of prepaid leases, aircraft, and prepaid fuel, and prepaid insurance, there were three categories.
>
> "Q. All right. But from what document did you conclude that the balance sheet reflected an asset, prepaid asset?
>
> "A. Those prepaid assets are shown on December 31, 1984 b[a]lance sheet of Ed Hager.
>
> "Q. And it was your conclusion in connection with this audit that you performed that those prepaid assets did not exist.
>
> "A. No, they did not.
>
> "Q. And you wrote off what amount again?
>
> "A. All of the prepaid balances.
>
> "Q. Would you give us that balance once more?
>
> "A. Approximately $57,000 in total."

As noted supra, an appeal court must ignore the evidence of the unsuccessful party in conflict with that of the successful party. Here, the evidence of the successful party on this issue came from the compilation of Hager, and that of the unsuccessful party came through the testimony of Simpson.

Additionally, a "write off" of "approximately" $50,000 or $57,000 because the witness "concluded" that the figures represented assets that did not exist is not clear and convincing evidence.

"The elements of a claim for relief for fraud are a false representation made by the defendant which is relied upon by the plaintiff to his damage, the asserted false representation must be made to induce action, and the plaintiff must reasonably believe the representation to be true. *Anderson v. Foothill Industrial Bank*, Wyo., 674 P.2d 232, 238 (1984). A plaintiff who alleges fraud must do so clearly and distinctly, and fraud will not be imputed to any party when the facts and circumstances out of which it is alleged to arise are consistent with honesty and purity of intention. *Reed v. Owen*, Wyo., 523 P.2d 869, 871 (1974). Fraud must be established by clear, unequivocal and convincing evidence, and will never be presumed. *Kincheloe v. Milatzo*, Wyo., 678 P.2d 855, 862 (1984).

"The elements of a negligent misrepresentation claim are generally recognized to be as follows: False information supplied in the course of one's business for the guidance of others in their business, failure to exercise reasonable care in obtaining or relating the information, and pecuniary loss resulting from justifiable reliance thereon. Restatement of Torts (Second) § 552, p. 126 (1977)."

*Duffy v. Brown*, 708 P.2d 433, 437 (Wyo. 1985).

With reference to the accounts receivable, RMH and Air contended that $50,645 thereof was not collectible. The figure was presented by witness Knudsen, office manager of Air. She testified that the figure was the total of invoice amounts listed on an Air computer printout dated May 1985, minus the total of invoice amounts thereon which she determined to have been paid up to "about 2 to 3 weeks" before trial.

On cross-examination she acknowledged some deficiencies in the method used by her. She testified to collection efforts by correspondence and telephone calls to customers such as Emory, Worldwide, Airborne, Purolator, Federal Express, etc., but that such efforts were hindered by lack of back-up documentation. She also testified that collection efforts were not pursued through use of collection agencies or legal recourse. RMH and Air acknowledged that, "It is true that Air Today did not want to create conflict with customers with whom it was still doing business." Recognizing that referral to collection agencies or legal recourse is not necessary to establish the collectibility of accounts—other circumstances being sufficient to do so—the stated purpose of avoiding "conflict with customers with whom it was still doing business" could have been an element considered by the trial court in its finding that: "Further, Defendants have failed to show that the stated accounts receivable were indeed uncollectible."[8]

The evidence in this instance was sufficiently indefinite and incomplete with reference to the status of the accounts receivable and to collection efforts to warrant the trial court's finding concerning the failure of RMH and Air to carry "their burden of proof with regard to the alleged breach" and concerning the finding quoted supra relative to the collectibility of such accounts—certainly the evidence presented by RMH and Air would not support their claim in a "clear, unequivocal and convincing" manner necessary to a successful fraud action. *Duffy*, 708 P.2d 433.

■ RMH and Air contend that there is an inconsistency in the judgment by virtue of the denial by the court of their claim based on misrepresentation and breach of warranty regarding the write-off of prepaid assets and collectibility of accounts receivable, whereas the court awarded them $9,067.33 on their claim based on a representation and warranty of McIntosh and Freight relative to taxes having been

8. With reference to the collectibility of the Purolator Courier account, Air did not accept an offer in a letter from Freight dated April 1, 1986, which read:
"Air Freight, Inc. will accept an assignment of the Purolator receivable, which totals approximately $37,000.00, and will subtract the total amount assigned from the amount owed Air Freight, Inc. by Air Today, with any remaining credit balance being applied to the amount owed to Kenneth Mc[I]ntosh."

paid for the time prior to May 31, 1985.[9]

However, the representation and warranty relative to taxes anticipated the possibility of a tax deficiency and provided for the payment thereof. Section G of Article Two of the Stock Purchase Agreement of October 4, 1985 provided:

"G. Within the times and in the manner prescribed by law, AIR TODAY, insofar as Shareholder is aware, has filed all federal, state, and local tax returns required by law, including employment taxes for the states of Colorado, Montana and Wyoming, and has paid or accounted for all taxes, assessments of which it is aware, and penalties due and payable. The federal income tax returns of AIR TODAY, if audited by the Internal Revenue Service for any fiscal years to and including the fiscal year ended December 31, 1984, and the results of these audits are accurately reflected in the financial statements. The provisions for taxes reflected in AIR TODAY'[s] consolidated balance sheet as of April 30, 1985, are adequate for any and all federal, state, county, and local taxes for the period ending on the date of that balance sheet and for all prior periods whether or not disputed. *Seller specifically warrants* full payment through May 31, 1985, of the following obligations: Federal Excise Tax; Federal Unemployment Tax; Colorado State Unemployment Tax; Montana State Unemployment Tax[;] Wyoming State Unemployment Tax; and FICA as it applies to AIR TODAY.

"In the event that Buyer or any other governmental agency having the obligation to collect the enumerated taxes levies a charge or assessment for said taxes, Buyer shall promptly notify Seller of such charge or assessment and the *Seller thereafter shall have the obligation and right to investigate, negotiate with and, if required, pay any deficiency in said unpaid taxes.* In the event Buyer ultimately is obligated to pay the same, after affording Seller the

opportunity to do so, Buyer shall have the right to charge against any amounts due the Seller, the amount of the assessment together with interest or penalties incrementally assessed thereon. Both parties agree to exercise prudent judgment in the evaluation of liability for any potentially unpaid taxes. In the event said assessment is supported and the tax ultimately paid, Seller shall incur its own expenses for accounting, legal or related fees and costs; otherwise, in the event said obligation is determined not to be due or owing, the costs, fees and expenses will be an obligation of AIR TODAY." (Emphasis added.)

None of the other sections of Article Two qualify the "to the best of their knowledge" provision of the introductory paragraph to Article Two by the "specifically warrants" language used in Section G. Nor do they set forth a procedure for adjustment of conditions which are contrary to the representation or warranty as does Section G.

The trial court's judgment and decree regarding a tax adjustment between the parties was pursuant to the provisions of Section G and not as damages for breach of such provisions.

## ENGINE RESERVES

### (Issues B and C of RMH and Air)

■ In response to Freight's claim in the complaint for $9,100 past due "engine reserves," Air and RMH presented evidence for the purpose of establishing that "chargebacks"[10] were overlooked during several months of the lease which should have offset payments which were made on "engine reserves." They argue that the net result is an obligation to them in the amount of $17,075.25. There was conflicting evidence as to which charges were for "engine reserves" and which were for "chargebacks."

---

9. The $9,067.33 award to RMH and Air was not made an issue on appeal.

10. "Chargebacks" are amounts spent on leased aircraft repair, maintenance and inspection other than that for engine, engine component and propeller overhaul.

A letter dated March 11, 1986, from McIntosh to witness Taft, a marketing representative for RMH who acted in a consulting basis to manage Air during the period after its sale by McIntosh, culminated a series of correspondence between them. It responded to the contentions of Air concerning "chargebacks" and "engine reserves" and concluded that the balance owed was $6,124.87. Except for a telephone call to obtain a copy of the lease, witness Taft did not respond to the letter. The trial court considered the evidence and accepted this figure as accurate. As noted supra, on appeal, we do not weigh the evidence. We accept that of the successful party as true. We affirm the district court on this issue.

## OPEN ACCOUNT

### (Issue B of McIntosh and Freight)

With reference to this issue, the judgment and decree provided:

"6. Plaintiff Air Freight, Inc., and Defendant Air Today, Inc., each asserted an open account balance to be due and owing from the other. Plaintiff Air Freight, Inc., substantiated the existence of its open account balance due from the Defendant Air Today, Inc., in the amount of $52,041.00. Alternatively, the Defendant Air Today, Inc., substantiated its open account balance due from the Plaintiff Air Freight, Inc., in the amount of $28,572.77.

"7. Based upon the foregoing, the court offsets the open account balance of the Plaintiff Air Freight, Inc., due from the Defendant Air Today, Inc., in the amount of $52,041.00 against the open account balance of the Defendant Air Today, Inc., from the Plaintiff Air Freight, Inc., in the amount of $28,572.77. Therefore, upon the stated offset, Plaintiff Air Freight, Inc., is entitled to Judgment from the Defendant Air To-

day, Inc., in the net amount of $23,468.23 for sums due upon open account."

McIntosh and Freight contest the offset. But instead of using the $28,572.77 judgment and decree figure, they use the figure of $19,573 in forming the issue presented by them to this court. In arguing the issue, they also use the figure of $19,-573.77. In their answer brief, RMH and Air also argue with reference to the $19,-573.77 figure. Inasmuch as the trial court did not make a finding of the basic facts upon which the $28,572.77 figure was premised,[11] and inasmuch as both parties now accept the $19,573.77 figure as the proper one in controversy with reference to the balance of the accounts receivable due Air and RMH from McIntosh and Freight, we conclude that the trial court's use of the $28,572.77 figure was a result of a mechanical or typographical error and was intended to be $19,573.77.

Since all parties agreed that witness Knudsen testified the account receivable balance owed Air from Freight was $19,-573.77, there was sufficient evidence of the successful parties on this issue to support the trial court's finding. However, Freight and McIntosh argue that Air's claim on an open account should not have been granted because there was a failure by Air and RMH (1) "to initially plead any cause of action for collection of open account," and (2) "to submit sufficient proof to substantiate the existence of the open account."

In connection with these contentions, it is important to note that an action on account (distinguished from that on an account stated) refers to the type of relation between the parties and not to any specific record; that its purpose is to avoid a multiplicity of suits, each based on a separate item or transaction; that it is founded on implied or express contract or contracts for the purpose of balancing a series of transactions between the parties; that admissibility of records, etc., are sub-

---

**11.** RMH and Air made a timely request for the entry of Findings of Fact and Conclusions of Law, and they objected to the proposed Judgment and Decree (1) as not stating the Findings of Fact separately from the Conclusions of Law as required by W.R.C.P. 52, and (2) as stating findings "in general, conclusory terms." The objections were not specifically ruled upon, but the proposed Judgment and Decree was entered. However, RMH and Air have not made the failure to sustain their objections a subject of appeal.

ject to the usual hearsay rule and exceptions thereto, e.g., business records; and that the elements for proof are substantially the same as in any other contractual or quantum meruit action.

With reference to McIntosh's and Freight's contention that the answer and counterclaim of Air and RMH was deficient in pleading a claim on an open account, such answer and counterclaim did not plead an action on account in the usual fashion. The usual method is set forth in W.R.C.P. 84 and the appendix referred to therein. W.R.C.P. 84 provides:

"The forms contained in the appendix of forms are sufficient under the rules and are intended to indicate the simplicity and brevity of statement which the rules contemplate."

Form 4 contained in the appendix provides:

"Complaint on an account.

"1. Defendant owes plaintiff ten thousand dollars according to the account hereto annexed as Exhibit A." [12]

In this instance, the answer and counterclaim contained a defense of "offset" and a counterclaim to amounts claimed, and one of the amounts claimed in the complaint was $50,375.20 for "services, goods, labor and materials" provided to Air. The claim for $50,375.20 was not set forth in the complaint according to Form 4, supra.

Although the open account claims were not pleaded as specifically as could be desired, a contention to the existence of an offset to the claimed open account was sufficiently established by Air and RMH—especially since there was no objection made at trial to the evidence concerning the open account on the basis of failure to have pleaded it in the answer and counterclaim.

With reference to the sufficiency of proof by Air and RMH of the open account, Freight and McIntosh acknowledge the testimony of witness Knudsen to the existence of an open account balance due from Freight in the amount of $19,573.77, but they contend that her oral testimony relative thereto without reference to, and introduction of, documentary evidence in support thereof and upon which her testimony was predicated is insufficient to support an award on an open account.

In an action on an account, identifiable charges and payments (debits and credits) together with beginning and ending balances of the account must be available to the party against whom the obligation is claimed in order that such party can contest one or more of such items. The exhibit attached to the complaint in accordance with Form 4, supra, usually supplies this information, but it can be furnished in other fashions, e.g., pursuant to a Bill of Particulars, the discovery procedure, by a witness during the trial, etc.

In this instance, the parties agreed that there was a zero balance on May 31, 1985. Witness Knudsen computed the balance of the account resulting from charges and credits subsequent thereto. McIntosh and Air had the computations at the time of taking her deposition before trial. Four or five errors in her computations were pointed out by McIntosh and Air at that time. At trial, she testified to the corrections made to correct these errors. She also testified that the rate used was that made by Air to McIntosh. She responded, "I have the worksheet" to the following question: "And do you have with you your file regarding the Air Freight account, what is owed by Air Freight to Air Today if anybody wants to ask you any questions about your figures?" Thus, the alleged debits and credits of the account were available for inquiry at trial.

Under the circumstances of this case, the trial court could properly find that the items upon which the open account was based were available to Freight and McIntosh, and that, in fact, they had reviewed them during discovery and had been made

---

**12.** The introductory statement to the forms reads in part:

"The following forms are intended for illustration only. * * * While these forms list allegations considered to be sufficient in a typical case, other proper allegations may be added or substituted as conditions may require."

aware of correcting computations. The trial court had evidence in favor of the successful party on this issue in the form of oral testimony as to the balance of the account being $19,573.77.

## REJECTION OF EVIDENCE BY WITNESS ALDEN RE: TAXES

(Issue D of McIntosh and Freight)

■ Witness Alden, vice president and general manager of Air since April 1986 was testifying on direct examination concerning the correspondence between Air and various tax authorities which was contained in Exhibit EEE when the following occurred:

"Q. That is both federal, both of those are federal taxes, is that correct?

"A. Yes.

"Q. Do you know the amount for those two?

"A. I do.

"MR. C. CHAPIN: I am going to enter an objection, at this time we don't have corporate records, and I don't think we have a foundation. I would object to any oral testimony relative to what those obligations are."

The court sustained the objection. Later, and after referring to Exhibit 22, the following occurred:

"Q. And could you give us your total figure of the taxes that are due from Mr. McIntosh, according to our claims?

"MR. C. CHAPIN: I am going to object to the question for lack of foundation. Again, I think the proper documentation resides in the corporate records, and they are not before the Court. So I object to oral entry of taxes at this point in time."

The court again sustained the objection. Air and RMH argue that the court erred in these two instances.

Exhibit EEE included correspondence and tax statements between Air and taxing authorities, i.e., Internal Revenue Service, Montana Department of Revenue, Colorado Department of Revenue and Wyoming Employment Security Commission. Exhibit 22 is a letter from the treasurer of RMH to

McIntosh which recited: "[A]n update on the various tax levies for unpaid taxes existing at May 31, 1985, they are as follows: * * *." It then set forth the tax amounts due Colorado, Wyoming, Utah and the United States. Whether the court sustained the objections on the basis of the best evidence rule or on the basis of failure to establish an exception to the hearsay rule (the taxes having occurred before the witness was associated with Air), a clear abuse of discretion on the part of the trial court in making these rulings is not shown:

"Evidentiary rulings are within the sound discretion of the trial court, and it is the burden of appellant to demonstrate that the trial court abused that discretion. Absent a clear showing of abuse of discretion, the trial court's ruling will not be disturbed. *Caterpillar Tractor Company v. Donahue*, Wyo., 674 P.2d 1276 (1983)."

*Banks v. Crowner*, 694 P.2d 101, 103 (Wyo. 1985).

"The question of allowing or excluding evidence is essentially a question for the trial court to decide. The exclusion or admission of the testimony is generally within the province of the trial court and the court's ruling will not be overturned absent a clear showing of an abuse of discretion. *Kielsmier v. Foster*, Colo. App., 669 P.2d 630 (1983); *Krueger v. State Farm Mutual Automobile Ins. Co.*, 707 F.2d 312 (8th Cir.1983)."

*Brockett v. Prater*, 675 P.2d 638, 641 (Wyo. 1984).

"A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by the court under the circumstances. *Eager v. Derowitsch*, 68 Wyo. 251, 232 P.2d 713 (1951); *Anderson v. Englehart*, 18 Wyo. 409, 108 P. 977 (1910); *DiPalma v. Wiesen*, 163 Conn. 293, 303 A.2d 709 (1972);

*In re Estate of Horman,* 265 Cal.App.2d 796, 71 Cal.Rptr. 780 (1968)."

*Martinez v. State,* 611 P.2d 831, 838 (Wyo. 1980).

"Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously."

*Martin v. State,* 720 P.2d 894, 897 (Wyo. 1986).

Applying the test for abuse of discretion set forth in Martinez and Martin to the contested rulings, an abuse of discretion did not exist. The exhibits prompting the questions to which objections were made were already in evidence. The judgment and decree awarded a setoff based on delinquent taxes. It provided in part:

"Pursuant to the terms and conditions of the October 4, 1985, stock purchase agreement, Plaintiffs warranted that the tax payments due for the operation of Air Today, Inc., were all paid or current as of May 31, 1985. However, the Defendants substantiated that there were delinquent taxes unpaid and due and owing as of May 31, 1985, in the amount of $9,067.33. Therefore, Defendant Rocky Mountain Helicopters, Inc., is entitled to an offset in the amount of $9,067.33 from the above stated Judgment acquired by the Plaintiffs against said Defendant."

## ATTORNEY'S FEES

### (Issue E of RMH and Air, and Issue A of McIntosh and Freight)

"Generally speaking, attorney fees are not recoverable unless there is specific statutory authority therefor, or unless such are provided for by contract." *Werner v. American Surety Company of New York,* 423 P.2d 86, 88 (Wyo.1967). And see *Bowers Welding and Hotshot, Inc. v. Bromley,* 699 P.2d 299 (Wyo.1985) and *United States through FHA v. Redland,* 695 P.2d 1031 (Wyo.1985).

The two promissory notes upon which two of the claims for relief in the complaint

of McIntosh and Freight were based contain the provision:

"Maker agrees to pay all expenses of collection, including a reasonable sum for attorney's fees."

Article Ten of the Stock Purchase Agreement provides:

"If any legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorney's fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled."

RMH and Air contend that the refusal of the trial court to allow the introduction of invoices reflecting their attorney's fees was error. The objection to the introduction thereof was on the basis that they had not been previously listed as an exhibit. The promissory notes do not provide for attorney's fees *to the maker* of the notes, and Article Ten of the Stock Purchase Agreement authorizes attorney's fees only for the "successful or prevailing" party. RMH and Air cannot be characterized as the "successful or prevailing" parties upon consideration of the amounts allowed them as setoffs compared to the amounts claimed by them as such, or as compared to the amounts awarded them as compared to the amounts awarded the other parties—even excluding the amount awarded the other parties on the promissory notes. The issue, then, as to the propriety of the trial court's rulings in connection with the introduction of the invoices are moot, i.e., such introduction could have no effect on the award of the requested fees.

"A case is 'moot' when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy. *Leonhart v. McCormick,* D.C.Pa., 395 F.Supp. 1073, 1076. Question is 'moot' when it presents no actual controversy or where the issues have ceased to exist. *Matter*

*of Lawson's Estate,* 41 Ill.App.3d 37, 353 N.E.2d 345, 347.

"Generally, an action is considered 'moot' when it no longer presents a justiciable controversy because issues involved have become academic or dead. *Sigma Chi Fraternity v. Regents of University of Colo.,* D.C.Colo., 258 F.Supp. 515, 523."

Black's Law Dictionary, 5th ed. 909 (1979). And see *Belondon v. State ex rel. Leimback,* 379 P.2d 828 (Wyo.1963).

Even if the invoices had been placed in evidence and if the amount of reasonable attorney's fees had been established, they could not have been awarded to the unsuccessful and non-prevailing party.

 McIntosh and Freight also contend that the court erred in denial of their attorney's fees. The judgment and decree recited:

"The Plaintiffs have sought, as a part of their cause of action upon the previously stated note, the payment of their attorney's fees by Defendant Rocky Mountain Helicopters, Inc. However, Plaintiffs have not segregated the value of the work performed by their counsel in preparation of their cause of action upon the stated notes from the value of the work done on other aspects of this case, as is required by the case law of the State of Wyoming. Therefore, attorney's fees cannot be awarded to Plaintiff in this action."

The opinion letter stated that such segregation was a requirement of a "recent ruling" of this court. The trial court was apparently referring to the ruling in *Miles v. CEC Homes, Inc.,* 753 P.2d 1021 (Wyo. 1988), wherein the trial court divided the amount of the fees in half and awarded the half to the one of two plaintiffs who had a provision in his agreement with defendant for the award of attorney fees, whereas the other plaintiff did not. On review, this court said:

"We cannot discern from the record an evidentiary basis for the trial court's de-

termination that CEC should receive one-half of the total amount of attorney fees. As far as we can tell, the only evidence to support this division of fees is the fact that there were two plaintiffs. This alone does not provide a sufficient evidentiary basis for the award."

Id. at 1027.

Although the facts of this case are not similar to those in *Miles v. CEC Homes, Inc.,* the basic rationale of Miles is applicable to this case.

If this matter were instituted only on the notes, and the plaintiffs were required to meet counterclaims in the nature of setoffs in order to prevail, it would be difficult and impractical to separate the legal work on the notes from that in opposition to the counterclaims, e.g., time spent in depositions will pertain to all intertwined issues.

However, in addition to claims on the notes, the complaint in this matter also had a claim for recovery of "engine reserves" under a lease of an aircraft.[13] Thus, it was obvious from the inception that a segregation of legal work would be necessary insofar as practical for a recovery of fees under the provision therefor in the notes.

The time involved on the accounts receivable issue was also not within the attorney's fee provisions of the notes or of the Stock Purchase Agreement—except insofar as the work on it was intertwined with the work relative to the notes and the issues based on the Stock Purchase Agreement.

The trial court could properly exercise its discretion in determining that the evidence was insufficient in segregating the legal work performed on the notes and with reference to the Stock Purchase Agreement from that performed on other aspects of the case which were not intertwined with work on the notes and that on the Stock Purchase Agreement.

The answer did not contest the obligation on the notes per se. It contended for an offset as set forth in the counterclaims. The trial was with reference to the claimed

---

**13.** Although Article Five, Section C of the Stock Purchase Agreement provided for receipt of rental payments on the aircraft, it made no

reference to the lease or to the "engine reserves."

setoffs and to the "engine reserves" requested in the complaint. Thus, the attorney's fee provision in the notes was only obliquely relevant.

"While the general rule is that a valid provision for attorney's fees in a note is as much an obligation of the contract as any part of it, the trial court still has discretion in exercising its equitable control to allow only such sum as it thinks reasonable. A trial court in its discretion may properly disallow attorney's fees altogether on the basis that such recovery would be inequitable. *Graves v. Burch*, 26 Wyo. 192, 181 P. 354, 5 A.L.R. 1216."

*Combs v. Walters*, 518 P.2d 1254, 1255 (Wyo.1974).

Under the circumstances of this case, it cannot be said that the court abused its discretion in not awarding attorney's fees to McIntosh and Freight.

### INTEREST

#### (Issue F of RMH and Air)

With reference to the two notes, the judgment and decree provided in part:

"1. Plaintiffs have Judgment against the Defendant Rocky Mountain Helicopters, Inc., principal in the amount of $39,-126.72, together with interest computed thereon at the rate of 13% per annum from and after October 4, 1985, which amount through June 1, 1988, is $14,-439.92, daily interest thereafter is computed at the rate of $14.13 until entry of Judgment.[14]

"2. Plaintiffs have Judgment against the Defendant Rocky Mountain Helicopters, Inc. in the amount of the value of the second note, $14,471.72, together with interest calculated thereon at the rate o[f] 13% per annum from and after August 1, 1985, which amount through June 1, 1988, is $5,356.54, daily interest thereafter is computed at the rate of $5.23 until entry of Judgment."

---

**14.** The Judgment was entered June 22, 1988.

**15.** The note was dated October 4, 1985.

One note was in the amount of $39,-126.72 "together with interest computed from even date herewith,[15] at the rate of Thirteen Percent (13%) per annum." The other note was in the amount of $14,471.72 "together with interest computed from August 1, 1985, at the rate of Thirteen percent (13%) per annum." However, the second note also provided: "Delinquent payments shall bear interest at the rate of Eighteen Percent (18%) per annum."

■ RMH and Air argue:

"Simple mathematics reveal that thirteen percent of $39,126.72 is $5,086.47. Dividing the annual amount of interest by 365 days leaves a daily reate [sic] of interest of $13.94. The period from October 4, 1985 through June 1, 1988 covers a period of 971 days. 971 days times $13.94 per day totals $13,535.74. Nevertheless, the court, based on the calculations of plaintiffs' counsel, awarded $14,-439.92 in interest.

"Following a similar pattern of simple mathematics, the interest awarded on the promissory note for $14,471.72, should have been $5,330.25, rather than the $5,356.54 awarded by the court."

McIntosh and Freight respond that their only dispute with reference to the $39,-126.72 note is that interest should be calculated on a 360-day basis rather than on a 365-day basis since "[t]he 360 day basis is the banking conventional method of computation of annualized interest." There is nothing in the record requiring the court to compute the interest other than as stated in the notes.

Accordingly, we will direct a correction in the amount awarded for interest by the trial court on the $39,126.72 note from $14,-439.92 to $13,828.48.[16]

■ The second note contained an interest amount of eighteen percent in the event of delinquent payments. RMH and Air contend that McIntosh and Freight cannot now request application of the eighteen percent

---

**16.** $13,535.74 computed as due by RMH and Air through June 1, 1988 plus $292.74 computed at the rate of $13.94 per day from June 1, 1988 to June 27, 1988, the date of the Judgment and Decree.

figure since the district court used a thirteen percent figure and the difference was not made an issue in their appeal. The issue concerning the inaccuracy in computation of interest on both notes was placed before this court in the appeal of RMH and Air. We must, insofar as we are able, correct such inaccuracies regardless of the effect on the respective parties. Using the method used by RMH and Air for such computation, eighteen percent of $14,471.72 is $2,604.91. Dividing $2,604.91 by 365 days results in a daily rate of interest of $7.14. The amount of interest for the 1056 days between August 1, 1985 and the date of the judgment is $7,539.84.

Accordingly, we will direct a correction in the amount awarded for interest by the trial court on the $14,471.72 note from $5,356.54 to $7,539.84.

Affirmed but remanded with directions to correct the figures in the Judgment and Decree relative to the amount of interest awarded on the notes and relative to the $28,572.77 figure allowed RMH and Freight for offset on the accounts receivable.