**HUSMAN, INC., a Wyoming corporation, Appellant (Plaintiff),**

v.

**TRITON COAL COMPANY, a Delaware corporation, Appellee (Defendant).**

No. 90–199.

Supreme Court of Wyoming.

April 22, 1991.

Rehearing Denied May 23, 1991.

Lawrence A. Yonkee and John A. Coppede of Redle, Yonkee & Toner, Sheridan, for appellant.

Patrick R. Day, Donald I. Schultz, and Mary J. Chinnock of Holland & Hart, Cheyenne, for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

MACY, Justice.

Appellant Husman, Inc. contracted with Appellee Triton Coal Company to remove overburden and topsoil from Triton Coal's mine site. After Husman began working on the project, it discovered that the material was saturated with water. When the contract was terminated, Triton Coal refused to pay the amount which Husman claimed was attributable to the soggy conditions. Husman filed suit against Triton Coal claiming breach of contract, misrepresentation, fraud, negligent misrepresentation, and breach of the covenant of good faith and fair dealing. Triton Coal filed a motion for summary judgment, which the district court granted.

We reverse and remand.

Husman postulates the following issues:

### I.

Whether there were genuine issues of material fact concerning whether [Triton Coal] concealed or withheld material facts and made positive misrepresentations on matters to which the undisclosed facts related.

A. Whether a contract's exculpatory clause bars a recovery where the evidence shows that an owner has breached its duty to disclose material facts to the contractor[.]

### II.

Whether genuine issues of material fact exist as to whether Triton [Coal] committed fraud by concealing or withholding material facts and making misrepresentations upon which Husman relied to its detriment.

A. Whether genuine issues of material fact exist[ ] as to whether [Husman] made a reasonable, diligent inquiry of the facts underlying its fraud claim.

B. Whether [Husman's] affirmance of the contract is a waiver of the fraud barring its right to recover damages.

## III.

Whether genuine issues of material fact exist[ ] as to whether [Triton Coal] induced [Husman] to enter into a contract by negligent misrepresentation.

## IV.

Whether genuine issues of material fact exist as to whether [Triton Coal] breached the contract and its covenant of good faith and fair dealing.

In March of 1988, Triton Coal invited Husman to submit a bid for the job of removing topsoil and overburden at a mine site in Campbell County. Triton Coal's business manager told Husman's vice president that the overburden was "an unconsolidated material and * * * it was probably a sandy clay type material." After two of its employees inspected the mine site and the material to be removed, Husman submitted a bid to Triton Coal. Triton Coal accepted the bid, and the parties entered into a contract on April 7, 1988, for the extraction of a minimum amount of overburden and topsoil. The contract contained a provision by which the. parties could extend the terms of the contract for the removal of additional amounts of overburden and topsoil. The contract also included the following provision:

> EXAMINATION OF PREMISES— Contractor expressly acknowledges that he has made a careful investigation of: The nature and location of the work to be performed hereunder; the character, quality, and quantity of materials and obstructions to be encountered; the character of equipment and facilities needed preliminary to and during the execution of the work; the general and local conditions and all matters which can in any way affect the work hereunder; and that he is fully informed with regard thereto.

After Husman began working, it discovered that the overburden was saturated with moisture and was more difficult to remove than it had anticipated. Husman continued to work on the project, however, and even agreed to extend the terms of the contract. The contract between Husman and Triton Coal was finally terminated on October 1, 1988, and Husman submitted invoices to Triton Coal for services rendered. Triton Coal disagreed with Husman's assessment, and Husman filed this suit.

In its complaint and amended complaint, Husman alleged, *inter alia,* that Triton Coal breached the parties' contract by failing to notify Husman that the overburden and topsoil were saturated with water and were unstable and by retaining part of Husman's payment; that Triton Coal willfully and intentionally misrepresented the subsoil conditions; that Triton Coal negligently misrepresented the subsoil conditions; and that Triton Coal, by concealing and misrepresenting the subsoil conditions, breached the covenant of good faith and fair dealing. Triton Coal answered Husman's complaint and filed a motion for summary judgment. The district court conducted two motion hearings, held that Husman was entitled to a payment subject to a final survey of the material it had removed, and granted Triton Coal's motion for summary judgment on the remainder of Husman's claims.

Summary judgment is proper when no genuine issues of material fact exist and the prevailing party is entitled to judgment as a matter of law. *Baros v. Wells,* 780 P.2d 341 (Wyo.1989); *Farr v. Link,* 746 P.2d 431 (Wyo.1987).

We review a summary judgment in the same light as the district court, using the same materials and following the same standards. We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record. A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties.

*Wagner v. First Wyoming Bank, N.A. Laramie,* 784 P.2d 224, 226 (Wyo.1989) (citations omitted).

## Fraud

■ Husman argues that the district court improperly granted Triton Coal's motion for summary judgment because genuine issues of material fact exist as to whether Triton Coal committed fraud by misrepresenting or concealing the conditions of the overburden and topsoil.

The elements in a cause of action of fraud are false representation made by the defendant which the plaintiff relies upon to his detriment. The false representation must be one which induces action and is reasonably believed by the plaintiff to be true.

*Garner v. Hickman,* 709 P.2d 407, 410 (Wyo.1985) (citations omitted). *See also Britton v. Bill Anselmi Pontiac–Buick–GMC, Inc.,* 786 P.2d 855 (Wyo.1990); *Rocky Mountain Helicopters, Inc. v. Air Freight, Inc.,* 773 P.2d 911 (Wyo.1989); and *Duffy v. Brown,* 708 P.2d 433 (Wyo.1985). To prevail, a plaintiff must establish fraud by clear and convincing evidence. *Duffy,* 708 P.2d 433. Conduct or words which tend to produce an erroneous impression may satisfy the plaintiff's burden. *Britton,* 786 P.2d 855. In addition, even if someone is not under a duty to speak, if he does speak, he is under a duty to speak truthfully and to make a full and fair disclosure. *Id.; Meeker v. Lanham,* 604 P.2d 556 (Wyo.1979).

Husman asserts that genuine issues of material fact exist given the depositions of Husman's vice president and one of its job superintendents. The vice president testified that the following exchange occurred when he visited the mine prior to Husman submitting its bid for the project:

Q. Did you ask the Triton representatives about whether the material was wet or dry or about its moisture content?

A. No, I didn't.

Q. Did you consider it obvious that the material was dry?

A. I said it looked dry. I said it looked normal. And there wasn't a response.

Q. After approaching the material on the high wall and getting back in the van, you said that it looked normal compared to the type of material you'd encountered in the area previously?

A. Yes.

Q. Did you say that it looked dry to you?

A. I don't believe I said that it looked dry. I said—I can't remember exactly what I did say, but as I—as I recall, I made some remark that it looks like pretty standard material for the Powder River Basin. Those certainly weren't the exact words, but that's the gist of what I recall.

Q. At any time prior to signing the purchase order with Triton, did you have any specific conversation with Triton representatives about the moisture content or the wet or dry nature of the material?

A. No, I didn't. Looking at the material from the surface and in the exposed cut face, it looked like a number of jobs we'd looked at previously and bid on previously, and there was never any indication otherwise.

Q. Did you observe any freestanding water at any time during your site visit? And I should limit it to the proximity of the area where you were planning to work or bidding to work.

A. Not that I recall. There was certainly some water down in the bottom of the pit, but not up in the area where we'd be working.

The job superintendent made the following statements during his deposition:

Q. Now you mentioned that while you were on this initial visit to deliver the bid and look at the site there may have been some discussion about water, but you said it was a little vague. What's your best recollection about what was discussed?

A. I don't think we discussed too much at all except, you know, the fact that, "Is there water?" "No, there's not much water," and that was about the

extent of it. We had the impression from Triton that there wasn't much water in that area of the pit.

Q. On what basis did you get that impression?

A. Just on the conversations that we had.

Q. So the conversations about, "Is there water?" "No, not much water," those involved the Triton people?

A. I believe so. You know, we were out in the pit and I think Steve showed us around and asked about the water that was standing at the toe of the high wall there. And, of course, the snow was dozed up in there and there was a little bit of mud. And, you know, "Is that water coming out of the dirt?" "No, that's pretty much just from the snow that they dozed off the top of the coal to clean the coal."

And then, you know, in talks about what the material was like, it was—it was—we were led to believe it was sandy on consolidated, loose material.

Q. Did that turn out to be the case?

A. No.

Q. Okay. What was different?

A. A lot of inherent water, more like mud than sandy on consolidated material.

    \*      \*      \*      \*      \*      \*

Q. When did you first get into the overburden with this wet consistency?

A. Second week we were on the job.

Q. Was it during the first times you started to excavate overburden?

A. When we were stripping topsoil in the south pit the first week we were on the job, I had a dozer in the north pit pioneering a ramp for scraper traffic. When we got into the overburden area, that dozer got stuck near the toe of the ramp that he was pioneering and we had nothing to pull him out.

Triton, after I requested some assistance, they sent a 992 up and with—a 992 and they had a small loader. I can't remember the size of that small loader that they brought up there. It was smaller than a 980. But anyway, they brought the 992 up and the small loader and they finally got our dozer out.

And there was five or six of their craft hands up there. And after we got it out, everybody was brushing the dirt off and having a little BS session. And it came to light that they had one of their shovels stuck in that same spot the previous year and it was a big joke to those gentlemen that Triton had brought in an independent contractor because they didn't think they could move the mud with the equipment that they had.

Viewing that testimony in a light most favorable to Husman and giving Husman all reasonable inferences, we hold that genuine issues of material fact exist as to whether Triton Coal misrepresented the soil conditions and as to whether that misrepresentation amounted to fraud.

Triton Coal argues that Husman is not entitled to a reversal of the summary judgment because Husman failed to review hydrology and soil data which had been compiled before it submitted its bid. That data included the mine permit application which Triton Coal filed pursuant to the Wyoming Environmental Quality Act. Whether Husman conducted a reasonable investigation of the conditions of the overburden and the topsoil is a question of fact. As stated, one of the elements of fraud is whether the representation "is reasonably believed by the plaintiff to be true." *Garner*, 709 P.2d at 410.

■ Triton Coal also argues that Husman is barred from raising its claims because of the "Examination of Premises" clause contained in the contract. We hold that the "Examination of Premises" clause does not prevent Husman from raising its fraud and misrepresentation claims because a "contract clause which requires a contractor to rely upon its own inspection does not control when there is a finding of misrepresentation as to existing conditions." *Cook v. Oklahoma Board of Public Affairs*, 736 P.2d 140, 147 (Okl.1987). It is not unreasonable for a contractor to rely upon the owner's representations and, therefore, limit its investigation.

■ Triton Coal asserts that Husman should not be allowed to raise the claims

which resulted from its removal of overburden and topsoil under three contract extensions. The parties entered into the original contract in April 1988. In May, July, and August 1988, they agreed to alter that agreement to cover the removal of additional amounts of topsoil and overburden. Triton Coal contends that Husman is barred from seeking damages under the extended terms of the contract because at the time Husman agreed to the extensions it had worked with the material and had full knowledge of the soil conditions.

The question posed by Triton Coal should be answered by the trier of fact. Under our standard for fraud, a plaintiff's reliance upon a misrepresentation must be reasonable. If Husman was not damaged due to a reasonable reliance upon a false representation made by Triton Coal, then it is not entitled to a recovery. That principle applies to Husman's claim under the original contract and to its claims attributable to work performed under the contract extensions.

### Negligent Misrepresentation

■ Husman contends that the district court improperly granted Triton Coal's motion for summary judgment on Husman's claim for negligent misrepresentation. The elements of negligent misrepresentation are as follows: "False information supplied in the course of one's business for the guidance of others in their business, failure to exercise reasonable care in obtaining or relating the information, and pecuniary loss resulting from justifiable reliance thereon." *Duffy*, 708 P.2d at 437.

We hold that the same evidence which gives rise to the existence of genuine issues of material fact on the issue of fraud also reveals that genuine issues of material fact exist in regard to the issue of negligent misrepresentation. That evidence, viewed in the light most favorable to Husman, indicates that Triton Coal may have supplied Husman with false information in the absence of reasonable care and that Husman may have suffered a pecuniary loss from a justifiable reliance upon that

information. The question should be submitted to a trier of fact.

### The Covenant of Good Faith and Fair Dealing

Husman asserts that the district court erred when it granted Triton Coal's motion for summary judgment on Husman's claim for breach of the covenant of good faith and fair dealing. Husman argues that every contract contains a covenant of good faith and fair dealing and that Triton Coal breached that covenant by misrepresenting the soil conditions, by failing to assist Husman with the removal of the water, and by failing to conduct surveys to determine the amount of overburden which Husman had removed.

■ Contrary to Husman's contention, this Court has not expressly stated that every contract contains an implied covenant of good faith and fair dealing. Husman's assertion that Triton Coal's alleged misrepresentation of the soil conditions breached the covenant of good faith and fair dealing is not well taken when applied to the facts of this case. Restatement (Second) of Contracts § 205 (1981) states, "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." The duty is a contract term which courts supply to insure a notion of fairness. 2 E. Farnsworth, Farnsworth on Contracts § 7.17 (1990). "The duty of good faith is therefore not imposed on parties until they have reached agreement and does not bind them during their earlier negotiations." *Id.* at 313. *See also* Restatement (Second) of Contracts, *supra* at comment c. Parties subjected to bad faith before a contract is entered into are not without recourse, however, because "[p]articular forms of bad faith in bargaining are the subjects of rules as to capacity to contract, mutual assent and consideration and of rules as to invalidating causes such as *fraud* and duress." *Id.* at 100 (emphasis added). Hence, even if we were to add the good faith and fair dealing term to Husman's contract, Husman's recourse for Triton Coal's alleged misrepresentation is an action for fraud or negligent misrep-

resentation and not an action for breach of the implied covenant of good faith and fair dealing.

■ Husman also asserts that Triton Coal breached the duty of good faith and fair dealing by refusing to help with the water problem after Husman began working on the project. Triton Coal was under no duty to help with Husman's removal of the overburden and topsoil. If Triton Coal misrepresented the soil conditions before Husman agreed to the contract, then Husman will be entitled to recover damages pursuant to its fraud or negligent misrepresentation claim. If the trier of fact determines that Triton Coal did not misrepresent the soil conditions, then Husman simply got what it bargained for, and the water problem was its problem.

■ Finally, Husman claims that Triton Coal breached the covenant of good faith and fair dealing by failing to conduct surveys to determine the amount of overburden which Husman had removed. This argument can be addressed by examining the terms of the contract. The initial agreement called for Husman to remove a minimum of 800M BCY of topsoil and overburden. The contract stated that Husman would "guarantee a minimum production of 400M BCY cumulative per month. Penalty for not obtaining this production minimum will be a reduction in price of $20,000 per month." It also provided, "Volume calculation for determining material moved will be by cross section or aerial photography." While the contract did not say whether Triton Coal was required to calculate the amount of the material removed at the end of the two months or during the course of Husman's performance, Husman argues that Triton Coal should have made the calculations while Husman was removing the material so that Husman would know if it was behind schedule. Husman asserts that, as a result of Triton Coal's breach, Husman was penalized under the terms of the contract because it did not remove the material quickly enough.

We hold that the contract term requiring a volume calculation is ambiguous. *See True Oil Company v. Sinclair Oil Corpo-* *ration,* 771 P.2d 781 (Wyo.1989) (whether a contract is ambiguous is a question of law). Consequently, summary judgment is inappropriate, and the matter is remanded to the district court for determination of whether Triton Coal was only obligated to calculate the volume of material removed after the contract was terminated or was also obligated to conduct surveys during the course of Husman's performance. *See Carlson v. Carlson,* 775 P.2d 478 (Wyo. 1989).

Reversed and remanded for further proceedings in accordance with this opinion.