**Gary D. EPPLE and Peggy E. Epple, husband and wife, Appellants (Plaintiffs),**

v.

**Michael L. CLARK and H. Bernadette Clark, husband and wife, Appellees (Defendants).**

No. 89–228.

Supreme Court of Wyoming.

Jan. 15, 1991.

H.W. Rasmussen of Badley & Rasmussen, P.C., Sheridan, for appellants.

Richard M. Davis, Jr. and Anthony T. Wendtland of Burgess & Davis, Sheridan, for appellees.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

GOLDEN, Justice.

This appeal raises a question concerning the liability of a former homeowner to a subsequent homeowner for alleged misrepresentations and fraud relating to the condition of the basement of the house. The subsequent homeowners state the sole issue as:

> The trial court erred by ignoring the uncontroverted evidence `and applying the standard [Restatement (Second) of Torts § 353] when it should have applied [Restatement (Second) of Torts § 552C].

We affirm.

## FACTS

In October, 1981, Mr. and Mrs. Michael L. Clark (Clarks) moved into their newly constructed home located in Sheridan, Wyoming. Having selected house plans from a catalog, they purchased a lot and hired a contractor to build the house based on the mail order plans.

On September 13, 1982, the Clarks found surface water in the basement of the house during a rain and snow storm. The storm caused a power outage; consequently, the Clarks' portable submersible sump pump failed to operate. This, in turn, permitted water to enter the basement through the sump pump hole. When power was restored, the pump operated and the Clarks swept the excess water into the sump pump hole, allowing the pump to remove the water from the basement. The Clarks' home insurance carrier denied their claim for wet carpet and water stained paneling due to the water.

On July 21, 1983, the Clarks found water in the basement and the pump running. They discovered their neighbor had irrigated all night in a field adjacent to the Clarks' property. The flooding irrigation water saturated the ground and migrated to the Clarks' property and into their basement. The Clarks notified their home insurance carrier of this event. The 1982 and 1983 incidents of water in the basement were the only ones that occurred while the Clarks lived there.

In early 1984, Mr. Clark's employer notified him that he was being transferred to Alaska. The Clarks listed the home with Carroll Realty; one of the provisions of the listing contract recited that there were no known defects except those which were readily visible upon inspection. When this listing expired, the home had not been sold. The Clarks, through arrangements made by Mr. Clark's employer, entered into a contract with Merrill Lynch Relocation Management, Inc. (ML). As purchaser, ML was to pay the Clarks an agreed upon price for the house and hold it for resale. One of the provisions of the contract was that any knowledge of the physical condition of the house be disclosed to ML (as purchasers) by the Clarks (as sellers). Another provision recited that ML as purchaser relied on the representations of and information supplied by the Clarks as sellers.

After selling the home to ML, the Clarks moved. Later, ML sent them a warranty deed; all of the blanks on the deed were filled out except for the name of grantee.

At the request of ML the Clarks executed the deed as grantors, knowing the blank for the name of the grantee was not filled out.

In the meantime, Mr. and Mrs. Gary D. Epple (Epples) were in the process of moving to Sheridan and contacted Carroll Realty there in their search for a home. The Epples decided on the home formerly owned by the Clarks. The evidence is undisputed that the Clarks and Epples never met and never had any conversations before the Epples bought the house. It is also undisputed that the Epples had no meeting or conversation with any representative of ML before they bought the house. In their deposition testimony the Epples said they understood the Clarks had sold the house to ML and were gone.

The Epples dealt solely with Steve Carroll of Carroll Realty in the purchase of this house, and Carroll sent them a proposed contract covering the transaction. Upon advice of their lawyer, the Epples added a provision to the contract that the purchase was to be contingent upon the results of an inspection and evaluation of the house by a construction expert selected by them. They had earlier told Carroll they were not interested in any house with a history of water problems. Carroll told them he knew of no such problems with the house in question.

The Epples hired John Carroll, Steve's brother, as their construction expert to inspect the house. He reported there were "no evident structural problems that would in any way compromise the durability and livability of the home." He noted that the terrain east of the house sloped toward the foundation; however, he found no evidence of leakage. He opined that "should it become a problem in the future, it can be easily rectified * * *." He concluded "it is my opinion that there are no significant problems with the house. There are no defects in the house that would influence my purchase of the home."

After receiving John Carroll's report, the Epples bought the home from ML, with ML apparently inserting the Epples' name in

the grantee blank in the deed. The Epples moved into the house in November, 1984.

In the spring of 1985, the Epples found water on the basement floor, and each year since water has seeped into the basement. After investigating the matter, locating the Clarks, and attempting unsuccessfully to resolve the matter, the Epples sued the Clarks.

In their complaint the Epples sought to impose liability on theories of intentional failure to disclose a known latent defect, fraud, and negligent failure to disclose a known latent defect. In their answer, the Clarks denied liability; they also filed third party claims against ML and Carroll Realty. After discovery, those third party defendants moved for and were granted summary judgment. The Clarks also moved for summary judgment against the Epples. After reading the parties' memoranda and submissions, and hearing argument, the trial court granted the Clarks' summary judgment on the Epples' theories of fraud and intentional failure to disclose a known latent defect. The parties tried the case on the remaining theory of negligent failure to disclose a known latent defect. The trial court found generally in favor of the Clarks and against the Epples. This appeal followed.

■ The Epples ask that the summary judgment entered against them be reversed on their theories of intentional failure to disclose a known latent defect and fraud. Unfortunately, in both their written brief and oral argument, they failed to provide a statement of facts relevant to those issues with appropriate page references to the record. W.R.A.P. 5.01(3). *See also Jung–Leonczynska v. Steup,* 782 P.2d 578, 581 (Wyo.1989); and *V–1 Oil Company v. The Honorable Robert B. Ranck,* 767 P.2d 612, 613 (Wyo.1989). Moreover, in oral argument Epples' counsel conceded that his written brief did not contain any statement of law regarding the theories of liability that fell when summary judgment was entered. This court found no cogent argument or authority cited that would be convincing for a reversal of the summary judgment. Under these circumstances, we

shall not address the propriety of the summary judgment disposition. *Prazma v. Kaehne,* 768 P.2d 586, 588 (Wyo.1989); *Johnston v. Conoco, Inc.,* 758 P.2d 566, 570 (Wyo.1988); *Smith v. Ensley,* 752 P.2d 1374, 1377 (Wyo.1988).

■ Epples' sole thrust in their brief is a challenge to the court's judgment at trial against them on their theory of negligent failure to disclose a known latent defect. We have reviewed their challenge under our usual standard. "[W]e accept the evidence of the prevailing party as true, leaving out entirely the evidence presented in conflict therewith, giving every favorable inference which may fairly and reasonably be drawn from the prevailing party's evidence." *Pancratz Company, Inc. v. Kloefkorn–Ballard Construction Development, Inc.,* 720 P.2d 906, 908–09 (Wyo.1986).

The Epples claim the trial court erred in not applying the theory of liability of *innocent* misrepresentation as found in Restatement (Second) of Torts § 552C (1977). Their claim in this regard strikes us as rather curious since they presented the case to the trial court both in pleading and at trial on a negligence theory. As we understand § 552C of the Restatement, it is "a rule of strict liability for innocent misrepresentation of a material fact * * *." *Id.,* comment a, at 142. This court has taken a dim view of a litigant trying a case on one theory and appealing it on another. Further, we will not consider for the first time on appeal an issue neither raised nor argued to the trial court. *Thatcher & Sons v. Norwest Bank Casper,* 750 P.2d 1324, 1328 (Wyo.1988). Parties are bound by the theories which they advanced below. We find nothing in the record to indicate that the Epples raised or argued innocent misrepresentation to the trial court; the Epples asked the trial court to look at only the negligent misrepresentation issue. They cannot now complain that the court erred in not considering innocent misrepresentation. *Id.*

■ We note in passing that § 552C, which Epples would have the trial court apply, explains that the section is limited to

the immediate parties to the sale. Restatement, *supra* comment d at 144. The Clarks were not a party to the sale of the house to the Epples. Rather, the Epples bought the house from ML. Moreover, the Epples failed to prove that 1) the Clarks represented to them that the basement did not leak, 2) the Clarks made that representation to them for the purpose of inducing the Epples to rely upon it in acting as a part of the sale transaction, and 3) the Epples did in fact so rely on that representation. Restatement, *supra* comment c at 144-45. Thus, even had the trial court considered § 552C, it would have found the Epples' proof deficient.

Affirmed.

THOMAS, J., files a concurring opinion.

URBIGKIT, C.J., files a dissenting opinion in which MACY, J., joins.

THOMAS, Justice, concurring.

I agree with the result found in the majority opinion pursuant to which the judgment in favor of the Clarks is affirmed. For myself, I would be willing to affirm that judgment on the ground that the theory of negligent misrepresentation and the theory of innocent misrepresentation should have been disposed of by summary judgment. I say that because recovery under both theories is limited to those to whom the maker of the statement intends that it be communicated. Further, both theories require reliance upon the information communicated by the party seeking recovery. Finally, both theories depend upon inaccurate information being communicated, and none was in this instance.

After trial, the information found in this record is not substantially different from that presented to the district court in support of, and opposition to, the Clarks' motion for summary judgment. I am persuaded that there was no genuine issue as to any material fact. In granting a trial by denying the Clarks' motion for summary judgment on the issue of negligent misrepresentation, I believe the district judge was being generous, perhaps to the point of indulgence, to the Epples.

While the theory ultimately asserted in this court is that of innocent misrepresentation, as encompassed in the Restatement (Second) of Torts § 552C (1977), the theory apparently presented to the district court, because it was the one preserved for trial, was negligent misrepresentation as found in Restatement (Second) of Torts § 552. That theory, like all misrepresentation theories, assumes that false information was supplied to another who incurred loss because of his justifiable reliance upon the information. *Duffy v. Brown*, 708 P.2d 433 (Wyo.1985). *See Rocky Mt. Helicopters, Inc. v. Air Freight, Inc.*, 773 P.2d 911 (Wyo.1989).

The possibilities for supplying false information are limited by this record to only two events. The first of those was the listing by the Clarks of the property with Carroll Realty. The second was in the contract with Merrill Lynch Relocation Management, Inc. (ML). As to the listing with Carroll Realty, no liability could flow because of the limitation set forth in the Restatement (Second) of Torts § 552(2), which reads as follows:

"(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

"(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

"(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction."

The listing with Carroll Realty expired substantially prior to any involvement of the Epples with the property, and logic teaches that the Epples could not have been contemplated as members of any limited group of persons for whose benefit and guidance Clarks may have furnished the information in the listing. If that limitation in the Restatement (Second) of Torts has any significance, then that group, as a matter of

law, would be limited to those to whom Carroll Realty might offer the property pursuant to the listing.

The statement in the contract with ML might survive the limitation found in Restatement (Second) of Torts § 522(2) because one could infer from the record that the Clarks understood that ML would resell the property to someone. With respect to negligent representation, however, the definition of the tort assumes reliance upon the information, and the record is clear that, prior to the purchase, the Epples had no information relating to the contract between the Clarks and ML. They could not rely upon it. Furthermore, the record is equally clear that, in offering to purchase the property, the Epples reserved the right to have the property examined by their own engineering representative and that right, in fact, was exercised. The Epples' engineer reported no defects in the property, and the Epples, if they relied on anything, must have relied upon their engineer's report and not on the Clarks' statements.

Turning then to the theory of innocent misrepresentation, to which the Epples have shifted in this appeal, the Restatement (Second) of Torts § 552C also requires justifiable reliance upon a misrepresentation. As the majority opinion correctly notes, the application of that provision is limited to the immediate parties to the sale. Of more significance to me, however, is the fact that the Epples, as noted above, did not rely upon any representation by the Clarks. They relied upon the report of their engineer, and that report has an interesting significance in this case.

The Epples' engineer was never a party to this litigation. This omission is puzzling because the engineer, in effect, made the same representation that the Epples claim the Clarks made. That singular circumstance causes me to inquire, "what defect?" There was water in the basement twice while Clarks owned the property. On one occasion, a power failure caused by a storm prevented a sump pump from operating that otherwise would have kept the water from rising into the basement. That circumstance hardly seems to encompass a defect in the property. On another occasion, a neighboring landowner created what was an underground flood by over-irrigation of his property. The fact that water came into the basement as a result of a flood does not demonstrate a defect in the property. Instead, the record shows that normal and prudent measures were taken with respect to the construction of a dwelling in an area in which there was, on occasion, a high water table. The installation of a sump and the utilization of a sump pump to address that problem does not constitute a defect, patent or latent. Instead, it manifests a prudent construction design with the goal of avoiding damage to the property because of water rising into the basement. My analysis of these circumstances leads to the conclusion that the Epples' engineer correctly advised them that there was no defect in the property, and that is why he was not a party to the litigation.

The result then, as the progression clearly manifests, is that the only possibility for recovery from the Clarks was to turn to a remedy that is described in this way:

> "* * * It is a rule of strict liability for innocent misrepresentation of a material fact, made to another in a sale, rental or exchange transaction." Restatement (Second) of Torts § 552C comment a. at 142.

The Epples mistakenly conclude that the theory of innocent misrepresentation makes the Clarks an insurer with respect to the property. The thrust of the Epples' ultimate position is that the Clarks are liable because they owned the house at an earlier time. I do not believe that Wyoming is prepared to adopt that rule. It goes so far beyond our cases describing an implied warranty of habitability that those cases would have no future application. In recognizing the implied warranty of habitability, this court has gone as far as may be necessary to justify relief to subsequent purchasers of dwellings. It is important to remember that the Epples presented a warranty theory to the trial court; a summary judgment was entered against them with respect to it; and, in this appeal, they have

failed to prosecute any claim of error relating to that theory.

I agree that the decision of the trial court should be affirmed, but I would affirm it on these additional grounds as well as that set forth in the majority opinion.

URBIGKIT, Justice, dissenting, with whom MACY, Justice, joins.

In 1984, Gary D. Epple and Peggy E. Epple moved from Sterling, Colorado to Sheridan, Wyoming and purchased a new home in Sheridan. They contacted ERA Carroll Realty Co., Inc. which had unsuccessfully attempted to sell the house of Michael L. Clark and H. Bernadette Clark for a number of months but remained involved as a sales agency when the relocation arrangement process resulted in equity acquisition of the house by Merrill Lynch Relocation Management, Inc. from the Clarks. In result, the Clark house was presented to the Epples for sale by Carroll Realty.

The Epples had suffered through a basement water problem in a Westminster, Colorado house and placed highest priority on being saved the frustration of a recurrent experience. Dealing through Carroll Realty, undoubtedly knowledgeable about the house and the area where the house was situated, the Epples unfortunately asked the advice of Carroll Realty about an expert who could assure them that they would not be exposed to recurrent basement water problems if they purchased the Clark residence. Steve Carroll of Carroll Realty recommended his brother John Carroll as a construction expert from whom such assurance could be secured. Not so surprising, John Carroll found no water problems, Steve Carroll completed the sale, the Epples purchased the house and have suffered basement water problems each year since the purchase.

The fact of the matter, as undisputed in the record, was that the Clarks were knowledgeable about a general water problem in the area before they had the house built and then had repeated water problems in the basement. An explanation at trial of unusual occurrence cause was provided, but the unquestioned facts reveal annual water problems and at least one resulting insurance damage claim. Not only had the water intrusion occurred, but the house contained a basement sump pump. When the Clarks moved away to relocate in Alaska, they disconnected the sump pump and its connections and took it with them to Alaska.[1]

No one advised the purchasers that a sump pump had previously been used and then disconnected and taken away. No one advised the purchasers that sump pumps in the area were customary.[2] The record pro-

---

1. Perhaps to fend off the frozen tundra up north.

2. The date of occupancy of the house by the Clarks is not completely clear, but in September 1982, they filed a notice of claim with their homeowner's insurance carrier and stated that "[w]ater came up into basement because sump pump failed, because electricity was going off and on. Carpet, * * * storage got soaked. Damage to the paneling."

About ten months later, July 1983, another claim was filed with the homeowner's insurance carrier stating that they "[w]oke up this morning & found water in basement. We believe water came from irrigation being done by neighbors in subdv."

Prior to litigation, an exhibit reveals that counsel for the Clarks wrote to counsel for the Epples which included the following statements:

In addition, Mr. and Mrs. Clark strongly dispute your characterization of a latent defect in the house. There never has been a sump pump installed on the premises. At the time the house was constructed, an opening was made for a sump pump to be installed if necessary. The Clarks did not have a recurrent seepage problem which would have necessitated the purchase and installation of the sump pump. On two separate occasions, a portable, submersible pump was utilized to remove water in the basement. The first time water appeared in the basement was in the spring of 1982, and the second in 1983. No problem with seepage was experienced in 1981 or 1984.

\* \* \* \* \* \*

My clients are unaware of any insurance claims they filed for water damage.

In further communication, a letter was written asserting that only one insurance claim had been made and then further stated:

As I stated to you in my earlier letter, the Clarks never owned a sump pump, they did own a portable, submersible pump. If Mrs. Clark described it as a sump pump, she was in error.

vides a denial by Mrs. Clark that she ever told her counsel that they did not have a sump pump or that they did file insurance claims. The house was built in 1981; water problems occurred in the basement in September 1982 and July 1983; and the first owner moved out in 1984. The Epples had water problems regularly after their occupancy of the house commencing in the fall of 1984. The house purchase price was $134,000. The initial listing price in February 1984 was $175,000. The appraisal which was obtained to complete the sale indicated drainage unknown and sump pump—*none*. The home was located on 1.83 acres in a rural subdivision with 2,822 gross living area square footage and was a split level basement structure.

> The Epples employed a highly reputable Sheridan professional engineer, Larry D. Baccari, who concluded that a problem existed of "water entering the basement during periods where there is a high amount of surface moisture around the residence." He further noted:
>
> Mr. Epple noted that the water infiltration problem only occurs when there is surface moisture available. This information discounts the possibility that the water problem is the result of a rising groundwater table. Further, the water is entering around the perimeter of the basement walls, without necessarily filling the sump in the basement. This reinforces the expectation that the water source is surface water which is following the foundation walls down to the footings, then flowing under the footing or through the footing foundation wall joint, to enter around the perimeter of the basement slab.
>
> The surface drainage around the home is towards the home on what I believe to be the north and east sides (I am not sure of the true orientation of the home). This situation will continuously subject the home to surface water running up to the foundation walls on at least two sides of the home. It also appears that this condition will tend to saturate the area beneath the parking slab in front of the garage. It is my opinion that this continual introduction of excess moisture around and under the home, can be expected to lead to ongoing problems. At the very best I would expect the water infiltration to the basement to continue, and at the worst there could easily be displacement of footings and continual movement in the floor slabs which are poured on grade for the living room, dining room, atrium, kitchen, and garage.
>
> Appellee Michael L. Clark, with a bachelor of science degree in mining and engineering and ten years experience, could rationally be expected to know that a sump pump is a pump that is

However, in conjunction with the relocation agency sale, the Clarks signed a condition of the premises statement for Merrill Lynch (accompanied by a deed in blank). The statement, in part, certified:

19  WARRANTIES

\*      \*      \*      \*      \*      \*

(b) Sellers covenant, represent and warrant that to the best of their knowledge, information and belief the Sellers have disclosed to the Purchaser all information regarding the physical condition of the premises of which they have knowledge, and Sellers have not misstated or omitted any material fact with regard to any condition affecting the premises that if known would have an effect on the value of the premises.[3]

put in the sump in the basement to remove water before the basement floods. The testimony of H. Bernadette Clark revealed that the sump pump was installed when the basement floor was put in.

Q.  Did you ask him [building contractor] to put it in?

A.  No. I don't recall asking him to put it in. I would think maybe that was part of his job and that's probably his suggestion.

Q.  Did he just do it on his own?

A.  I'm not sure. I think we probably discussed it. We talked a lot as we built the home.

Q.  Isn't it true that you had discussed with your neighbors, Deurloos, that they had sump pumps and Mr. Larson having built their home recommended a sump pump for you?

A.  Yes, I think so.

3.  There are a lot of actors in this wet basement house problem as a fraud perpetrated upon the Epples. Why more if not all were not included in this litigation is undisclosed, although Merrill Lynch was once included and then dismissed by summary judgment on the basis of no knowledge of the water problem. We have here the original builders who, as occupants, knew that some problem existed and then willingly signed the resale form with its false certification of property condition.

The house was constructed on the alluvial plane topography in the Sheridan area, adjacent to irrigated farm land in an area of existent basement sump pump usage, built with a perimeter drain system and accommodated with a submersible sump pump. Anyone with fair knowledge of the Sheridan area would have known that an operational sump pump would be indispensable in the spring and that the house was "high risk" for basement water with overload power usage or flooding condition during that spring season with the raised sub-

I dissent not alone because the Epples, as completely innocent actors, were put upon by a combination of actors and are now without remedy, but also because the district court and now this court unduly compress the theories of recovery to justify nonrecovery. I do not segment the transaction in order to insulate the Clarks from vendor responsibility under any of the customary theories of liability afforded by Restatement (Second) of Torts § 552C (1977).

The Clarks knew there was a basement water problem; Steve Carroll probably knew there was a basement water problem; his brother John Carroll, the home basement condition expert, should have known there was a basement water problem; but Merrill Lynch, the amorphous property relocation agency, had no knowledge or reason to know that the certification no problem assurance supplied by the Clarks as the builder-owners was inaccurate.

In insulating a theory of habitability responsibility from a predecessor in ownership, the present decision is contrary to our recent decision in *Deisch v. Jay*, 790 P.2d 1273 (Wyo.1990). Conversely, I would not insulate the wrongful action from liability responsibility by the intervention of the relocation agency which essentially acted as a conduit for the finite result.[4]

On the record as presently presented, I would hold the summary judgment on fraud and breach of warranty to have been erroneous with significant issue of fact presented and the decision on the merits on the failure to disclose a known defect to be unsupportable as a matter of law. Theory development, pleading and appellate briefing is not, in my opinion, appropriate justification here for denial of justice to the innocent buyer from the misconduct caused by affirmative misrepresentation and negative failure to warn or advise resulting from conduct of the initial party responsible.

The Clarks knew they had a house with a basement water problem; they did not make that information available for the protection of the successors in house usage and ownership; and the Clarks also knew that the house they were selling would be resold by Merrill Lynch with both the ultimate buyer as well as Merrill Lynch relying on the condition of the premise certification which they signed to accomplish their sale. I am unconvinced that the buyer should bear the burden of resulting loss and/or diminished value for the damaged merchandise residence which they unwillingly purchased.

I would find the philosophy of Restatement (Second) of Torts as identified in philosophy with *Anderson v. Bauer*, 681 P.2d 1316 (Wyo.1984); *ABC Builders, Inc. v. Phillips*, 632 P.2d 925 (Wyo.1981); *Moxley v. Laramie Builders, Inc.*, 600 P.2d 733 (Wyo.1979); *Tavares v. Horstman*, 542 P.2d 1275 (Wyo.1975) as well as the more current case of *Deisch*, 790 P.2d 1273 and reverse both the granted summary judgment on intentional failure to disclose and the trial judgment of negligent failure to disclose and remand for a new trial.

---

surface water cycle inevitably to occur. Unfortunately, no one told the Epples any of this when the house was shown and the sale completed.

**4.** Merrill Lynch never took title. The deed was signed in blank by the Clarks and was completed by insertion of the Epples' names who consequently took title by warranty deed from the original builder-owners, the Clarks.